Drake, Ch. .1.,
delivered the following opinion:
Before the 12th of May, 1874, and between that day and the date of the institution of this suit, the claimant performed service for the Government, in the transmission of dispatches over its telegraph line, and in the transportation of mails, troops, munitions of war, supplies, and public stores upon its railroad. For filie services so rendered the accounting officers of the Treasury Department have approved and allowed accounts to the amount of $1,187,254.21, and that sum is now due and unpaid on account of those services.
There is no controversy as to the rights of the respective parties in regard to that sum. The defendants are entitled to retain one-half of it in the Treasury toward the ultimate payment of bonds of the United States issued to the claimant; and the claimant is entitled to be paid the other half, provided the defendants’ counter-claim cannot be set off against it.
. This counter-claim is for u five per centum of the net earn- *483 iugs ” of tlie claimant’s road after its completion, and is claimed by the defendants under section 6 of tlie Act of July 1, 1862, 11 to aid in the construction of a railroad and telegraph lime from the Missouri River to the Pacific Ocern, and to secure to the Government the use of the same for postal, military, cmd other purposes.” (12 Stat. L., 489.)
As in tlie decision of tlie questions arising under tbe counterclaim tlie third, fourth, fifth, and sixth sections of that act will be more or less brought under discussion, we present the mate-terial parts of them, as they were enacted, with some amendments incorporated, which were made by the Act of July 2, 1864 (13 Stat. L., 356).
“ Sec. 3. That there be, and is hereby, granted to the said company, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores thereon, every alternate section of public land, designated by odd numbers, to the amount of ten alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of twenty miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached at the time the line of said road is definitely fixed.
“ Sec. 4. That whenever said company shall have completed twenty consecutive miles of any portion of said railroad and telegraph line, ready for the service contemplated by this act, and supplied with ali necessary drains, culverts, viaducts, crossings, sidings, bridges, turnouts, watering-places, depots, equipments, furniture, and all other appurtenances of a first-class railroad— the rails and all tlie other iron used in the construction and equipment of said road to be American manufacture of tlie best quality — the President of the United States shall appoint three commissioners to examine the same and report to him in relation therein; and if it shall appear to him that twenty consecutive miles of said railroad and telegraph line have been completed and equipped in all respects as required by this act, then, upon certificate of said commissioners to that effect, patents shall issue conveying the right and title to said lands to said company, on each side of the road, as far as the same is completed, to the amount aforesaid; and patents shall in like manner issue as each twenty miles of said railroad and telegraph line are completed, upon certificate of said commissioners. Any vacancies occurring in said board of commissioners, by death, resignation, or otherwise, shall be filled by the President of the United States: Provided, hoto ever, That no such commissioners shall be appointed by the President of the United States, uuless there shall be presented to him a statement, verified on oath by the president *484 of'said company, that such twenty miles have been completed in the manner required by this act, and setting forth with certainty the points where such twenty miles begin and where the same end, which oath shall be taken before a judge of a court of record.
“ Seo. 5. That for the purposes herein mentioned the Secretary of the Treasury shall, upon the certificate in writing of said commissioners of the completion and equipment of twenty consecutive miles of said railroad and telegraph, in accordance with the provisions of this act, issue to said company bonds of the United States, of one thousand dollars each, payable in thirty years after date, bearing six per centum per an-num interest (said interest payable semi-annually), which interest may be paid in United States Treasury notes or any other money or currency which the United States have or shall declare lawful money and a legal tender, to the amount of sixteen of said bonds per mile for such section of twenty miles; and to secure the repayment to the United States, as hereinafter provided, of the amount of said bonds so issued and delivered to said company, together with all interest thereon which shall have been paid by the United States, the issue of said bonds and delivery to the company shall ipso facto constitute a first mortgage on the whole line of the railroad and telegraph, together with the rolling-stock, fixtures, and property of every kind and description, and in consideration of which said bonds may be issued 5 and on the refusal or failure of said company to redeem said bonds, or any part of them, when required so to do by the Secretary of the Treasury, in accordance with the provisions of this act, the said road, with all the rights, functions, immunities, and appurtenances thereunto belonging, and also all lands granted to the said company by the United States which, at the time of said default, shall remain in the ownership of the said company, may be taken possession of by the Secretary of the Treasury, for the use and benefit of the United States: Provided, This section shall not apply to that part of any road now constructed.
“ Sec. 6. That the grants aforesaid are made upon condition that said company shall pay said bonds at maturity, and shall keep said railroad and telegraph line in repair and use, and shall at all times transmit dispatches over said telegraph line, and transport mails, troops, and munitions of war, supplies, and public stores upon said railroad for the government, whenever required to do so by any department thereof, and that the government shall at all times have the preference in the use of the same for all the purposes aforesaid (at fair and reasonable rates of compensation, not to exceed the amounts paid by private parties for the same kind of service), and one-half of all compensation for services rendered for the government shall be applied to the payment of said bonds and interest until the whole amount is fully paid. Said company may also pay the *485 United States, wholly or in part, in tlie same or other bonds, Treasury notes, or other evidences of debt against the United States, to be allowed at par ; and after said road is completed, until said bonds and interest are paid, at least five per centum of the net earnings of said road shall also be annually applied to the payment thereof.”
■ The whole controversy in the case grows primarily out of these words at the close of the sixth section: uAnd after said road is completed, until said bonds and interest are paid, at least five per centum of the net earnings of said road shall also he a/mu-ally applied to the payment thereof.”
In support of the counter-claim, the defendants contend that the road was completed, within the meaning of those words, on or before the 6th of November, 1869; and that thereafter there were net earnings of the road, of which the claimant was bound to apply annually 5 per cent, to the payment of the bonds issued to it by the United States.
Against the counter-claim, the claimant insists that the road was not completed until the 1st of October, 1874; and that its net earnings were less than contended for by the defendants.
Two questions are therefore to be passed upon by the court, namely: 1. When was the Union Pacific Eailroad completed from Omaha to its western terminus, within the meaning of the act aforesaid 9 And 2. What were its annual net earnings after the date of its completion.
Before proceeding to discuss those points, a question raised by the claimant must be disposed of, for it suggests a view which, if sustained, would be fatal to any recovery on the counter-claim. The question is, whether it was not the purpose of section 10 of the Act of 1864 to postpone the payment of the 5 per cent, of the net earnings until the new mortgage debt and its interest, which that section authorized, should be first discharged "1
The following is the section referred to': .
“ Sec. 10. That section five of said act be so modified and amended that the Union Pacific Eailroad Company, the Central Pacific Eailroad Company, and any other company authorized to participate in the construction of said road, may, on the completion of each section of said road, as provided in this act and the act to which this act is an amendment, issue their first-mortgage bonds on their respective railroad and telegraph lines •to an amount not exceeding the amount of the bonds of the *486 United States, and of even tenor and date, time of maturity, rate and character of interest, with the bonds authorized to be issued to said railroad companies respectively. And the lien of the United States bonds shall be subordinate to that of the bonds of any or either of said companies hereby authorized to be issued on their respective roads, property, and equipments, except as to the provisions of the sixth section of the act to which this act is an amendment, relating to the transmission of dispatches and the transportation of mails, troops, munitions of war, supplies, and public stores for the Government of the Uifited States.”
We are unable to perceive how the effect suggested can be given to this section, or to see the force of the train of reasoning by which the learned counsel for the claimant sought to give it that effect. We need not stop to controvert his positions in detail, but will state our own views of the subject.
The Act of 1862, in aid of the construction of the Union Pacific Eailroad, made four different grants to the claimant, viz: 1. The right of way through the public lands; 2. The right to take from the adjacent public lands materials for the construction of the road; 3. Alternate sections of public land; and, 4. Bonds of the United States to the amount of $16,000 per mile.
The issue and delivery of those bonds to the claimant was declared by the act to constitute a first mortgage on the whole line of its railroad, together with the rolling-stock, fixtures, and property of every kind and description appertaining thereto.
That is the sole lien imposed by that act on the property of the claimant.
But the grants above specified are declared to be made upon four conditions, viz: 1. That the claimant should-pay said bonds at maturity; 2. That it should keep its railroad and telegraph line in repair and use; 3. That it should at all times transmit dispatches over said telegraph line, and transport mails, troops, and munitions of war, supplies, and public stores upon said railroad for the Government whenever required to do so by any department thereof; and, 4. That the Government should at all times have the preference in the use of the road and telegraph line for the purposes aforesaid.
In addition to the lien and conditions so imposed and declared, the sixth section made the provision aforesaid in regard to the five per cent, of the net earnings of said road.
That provision imposed an obligation on the claimant which, bjr accepting the charter, it agreed to fulfill; but it was not de- *487 dared that tliat obligation constituted a lien on the road, or that the grants made to the claimant, as above stated, were to be conditional upon the payment of the five per cent. It was simply a naked legal obligation, dependent for its fulfillment merely on the existence of net earnings.
Such being the state of the matter, the tenth section of the Act of 1804 authorized the claimant to issue $16,000 per mile of first-mortgage bonds, and, in connection with that authority, declared that “ the lien of the United States bonds shall be subordinate to that of the bonds * * * hereby authorized to be issued, except as to the provisions of the sixth section of the act to which this act is an amendment, relating to the transmission of dispatches and the transportation of mails,' troops, munitions of war, supplies, and public- stores for the Government of the United States.”
The confusion produced in that sentence, by declaring an exception where none in fact existed or could in the ñatee of things exist, since the matter excepted is wholly different in character from that from which it is excepted, tends to confusion in its construction. Without stopping to discuss it, we hold that the sentence means simply this: 1. That the Government yields its priority of lien on account of its bonds; and, 2. Eeasserts and reimposes the condition declared in the sixth section of the Act of 1862, as to the transmission of dispatches and the transportation of mails, troops, &e.
Has that provision any bearing on the five per cent, question involved in the present case? We think not. If it appeared that the earnings of the claimant’s road, after paying the expenses of its management and operation, were not sufficient to pay the interest on the first-mortgage bonds issued under the authority of that tenth section, we should not hesitate to hold that the Government could not demand the payment of the five per cent. But no such fact exists. ' On the contrary, those earnings are largely more than enough to pay both the interest on those bonds and the five per cent. No question, therefore, arises here, such as might arise between the Government and the first-mortgage bondholders, if the earnings were insufficient to pay that interest, and the Government should nevertheless insist on the payment of the five per cent. The question now is, whether that section, as between the claimant and the defendants, on the facts now shown to exist, affects the obligation *488 of the claimant to pay the five per cent. We are clear that it does not. It does not refer in terms to that obligation; nor does it release the claimant from its contract to pay at maturity the bonds received by it from the Government; nor does it annul or release the Government’s lien for the payment of those bonds. It simply subordinates “ the lien of the United States bonds ” to that of the first-mortgage bonds, and does no more; leaving the five per cent, obligation in full force, and not postponed until the new mortgage debt and its interest should be first discharged.
Proceeding now to consider the sections of the Act of 1862, in connection with the subject-matter of the completion of the road, there are certain propositions which do not need extended argument for their establishment, but may be considered as entirely plain on the mere reading of the sections, and not capable of being overthrown by any argument. They are as follows:
1. The obligation to complete the road rested solely on the claimant.
2. The completion of the road was, therefore, to be determined solely by what the claimant did in building it.
3. As rights and obligations inter partes depended'on the fact of the completion of sections of the road, and, finally, of the whole road, the fact of completion in each case was of necessity to be ascertained and declared in some way binding and conclusive on both parties.
4. The act prescribes how the fact of completion should be ascertained and declared.
5. The defendants having enacted and the claimant accepted that act, they thereby mutually agreed that the fact of completion should be ascertained and declared as in that act prescribed, and not otherwise.
6. When the fact of completion of any section of the road was ascertained and declared in the way prescribed in the act, that fact was finally and immovably settled and determined, as between the claimant and the defendants, and could not be unsettled or changed by any executive authority, nor, except for fraud, by any judicial authority.
We do not pause to comment upon or amplify these propositions, believing them too plain to need either comment or amplification. If this be so, then we have only to give the legal deductions which seem to us to flow from them.
*489 1. Iii tlie first place, tbe ascertainment and declaration, in tlie way prescribed in tbe act, of tbe completion of any section of tbe road, did, in and of itself, confer on tbe claimant tbe right to demand and receive lands and bonds, and impose on tbe defendants tbe obligation to convey and deliver tbe lands and bonds.
2. Tbe claimant, having demanded and received tbe lands and bonds, as provided in tbe act, for each several section of completed road from end to end of tbe line, expressly on tbe ground that each section was u completed and equipped in all respects as required by said act,” cannot be permitted afterward to deny tbe fact of tbe completion of any such section.
3. Tbe completion of tbe whole road, when ascertained and declared as aforesaid, did, in and of itself, confer on tbe defendants tbe right to demand, and impose on tbe claimant tbe obligation to pay, five per cent, of tbe net earnings of tbe road.
4. Tlie claimant having, through tbe oath of its president, affirmed tbe completion, “ as required by tbe act,” of each and every section of tbe whole road; and tbe fact of such completion having been ascertained and declared in tbe way prescribed and agreed upon, and tbe claimant having demanded and received tbe Ml benefit in lands and'bonds of such completion for each and every section of the road, it is not competent for it now to deny or question, except for fraud, tbe fact of tbe completion of tbe entire road; but it is absolutely estopped from so doing.
Tbe only escape from these conclusions is, that the completion referred to in section 6 is a different thing from tbe completion referred to in sections 4 and 5. This is, in effect, tbe mew urged by tbe claimant, as showing that tbe completion did not exist, for tbe purpose of taking money from it, until about five years after it bad existed for tbe purpose of its demanding and receiving lands and bonds. Of course, if tbe act was so framed as to require this extraordinary interpretation, it must be so interpreted; but such a meaning is not to be ascribed, unless tbe language leave no escape from it.
No intelligent and unbiased reader of those sections would suppose that they were intended to require two completions. There can be no such thing as two completions of any piece of work. There may be different degrees and. different stages of completion, but when completion is reached, that is the end.
*490 And yet the claimant insists that two completions were there authorized. And singularly enough, as the act is viewed by the claimant, each completion was to inure to its benefit, and each to operate adversely to the defendants. This is to say, to enable the claimant to get lands and bonds, the road was complete in 1869; but to entitle the Government to the five per cent, of the net earnings, the road was not completed till 1874. It seems to us impossible that any such one-sided absurdity could have been intended. The completion referred to in the sections above set forth was one. In section 4 it is a completion by sections; in section 6 a completion of the aggregate of all the sections.
The sole answer to this, attempted by the claimant, is, that to the President of the United States was confided by law the supervision of the construction of the road, and that he never formally ascertained and determined that the road was finally completed until November, 1874, when he determined that it was completed on the 1st of October, 1874.
There is nothing in this position, unless it be shown that the law devolved on the President the duty of ascertaining and determining when the road rvas “finally completed.” No such duty was imposed on him. In fact, the law did not raise the question of final completion of the road. The statute nowhere uses the word final or finally in that connection. Had it done so, the case would have been involved in greater difficulty than it is; for it would have been almost impossible to decide when the point of final completion had been reached; that is, the point at which nothing more could be done to bring the road up to the highest state of completeness that the intellect and knowledge and skill of man could devise. The language of the act which was to be applied, and was in fact applied, by sections, to every foot of the road from its eastern to its western terminus, was as follows:
“Whenever said company shall have completed twenty consecutive miles of any portion of said railroad and telegraph line, ready for the service contemplated by this act, and supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turnouts, watering-places, depots, equipments, furniture, and all other appurtenances of a first-class railroad, * * * the President of the United States shall appoint three commissioners to examine and report to him in relation thereto; and if it shall appear to him that twenty consecutive miles of said *491 railroad and telegraph, line have been completed and equipped in all respects as required by this act, then, upon certificate of said commissioners to that effect, patents shall issue conveying the right and title to said lands to said company, on each side of the road as far as the same is completed, to the amount aforesaid; and patents shall in like manner issue as each twenty miles of said road and telegraph line are completed, upon certificate of said commissioners. * * * For the purposes herein mentioned the Secretary of the Treasury shall, upon the certificate in writing of said commissioners of the completion and equipment of twenty consecutive miles of said railroad and telegraph, in accordance with the provisions of this act, issue to said company bonds,” &c.
Now, the claimant practically insists that the road was not to be considered as having reached completion within the meaning of this language until it had reached completeness ; but this was not, in our opinion, the intent of the law. The act does not require an entirely complete first-class railroad, but a rad-road “completed and" equipped in all respects as required by this act.”
And what constituted such a road % Changing the collocation of the clauses, but not in the least changing the meaning, the requirements of the acts were simply these, and no more: 1. That the road should be “ supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turnouts, watering-places, depots, equipments, furniture, and all other appurtenances of a first-class railroad”; and, 2. That the road should be “ready for the service contemplated by this act”; which service, as stated in section 3, was “the safe and speedy transportation of the mails, troops, munitions of war, and public.stores.”
It seems to us clear that this language did not require the sections of the road, when examined, to be in the highest condition of completeness attainable in a first-class railroad, but only in such state of completion, in the parti culars above recited, as to be ready for the service contemplated by the act. If we had any doubt on this point, it would be removed by the language of the proviso to the fourth section, requiring an oath to be made by the president of the claimant in order to obtain the appointment of commissioners to examine and report upon a section of the road. That officer was required to swear, not that the section had reached completeness, but that it had been11 completed in the manner required by the act.”
If this mew be correct, then it is undeniably true that every mile of the road was found and reported by commissioners, *492 appointed as prescribed in tbe act, to bave been completed and equipped as a first-class railroad and ready for service, and that the President of the United States acted upon every one of their reports, and ordered patents for lands and bonds to be unconditionally issued to the claimant for each section of the road as so reported.
And here, in our judgment, ended the authority of the President in the matter. There is not, as we consider, the least ground for claiming that the supervision of the construction of the road was confided to him by law. Nor is there any ground for claiming that he was authorized to ascertain and determine whether the road was finally completed. His whole authority was (1) to appoint commissioners to make report to him, and (2) when they reported, to say whether it appeared to him that twenty consecutive miles of the road had been “ completed and equipped in all respects as required by this act.” When he performed those two duties his functions were ended. And when the commissioners made report to him that the westernmost and last section of the road was so completed and equipped, and he signified that it so appeared to him, then the whole road was, within the meaning and for the purposes of the act, a completed road ; and nothing which the President might afterward say or do could have effect in law to make it otherwise. It is upon the President’s further action in the premises, now to be considered, that the claimant bases its demand for the fixation of October 1, 1874, as the day of the completion of the road.
On the 9th of February, 1869, the Secretary of the Interior laid before the President the report of the commissioners upon the two sections, of twenty miles each, “ commencing at the 960th and terminating at the 1000th mile-post west of the initial point on the Missouri Biver near Omaha ”; the latter mile-post being only 38.68 miles from the western terminus of claimant’s road, as ultimately established.
The report represented those sections as “ ready for present service, and completed and equipped as a first-class railroad”; and the Secretary of the Interior recommended u the acceptance of the same, and the issue to said company of bonds and of patents for lands due on account of said sections.” The President, on the same 9th of February, 1869, indorsed on the Secretary’s letter these words: “ The within recommendations of the Secretary of the Interior are approved, and the Secretary of the *493 Treasury and liimself are hereby directed to carry the same into effect.”
This was exactly what had. been done in the case of each previously-examined section of the road, except some of the first, which were reported as in some respects deficient, but the defects were afterward remedied. Therefore, on that 9th of February, 1869, it was a fact, undisputed and indisputable, that one thousand miles of the claimant’s road had been reported upon by commissioners and accepted by the President of the United States as “ ready for present service, and completed and equipped as a first-class railroad.” This was all that the statute required to entitle the claimant to the benefits resulting from the construction of its road. There the claimant was lawfully entitled to rest, and demand and receive all those benefits.
But the claimant chose not to rest there; but, three days after all its rights up to the 1000th mile-post had been settled and fixed in the manner prescribed by law, it engaged in a transaction which has so important a bearing on this case that special notice must be taken of it, for out of it springs and upon it rests the claimant’s demand upon the court to fix the 1st of October, 1874, as the date of the completion of the road, from and after which the claimant was bound, if bound at all, to apply 5 per cent, of its net earnings to the payment of the bonds issued to it.
This was the transaction: On the 12th of February, 1869, when only 38.68 miles of its road remained to be constructed, the claimant signed two written declarations and agreements, which, in effect, formally admitted and declared that its road up to the 1000 mile-post had never been completed and equipped as a first-class railroad, and, therefore, that the previous reports of the commissioners were false. The .first of those writings agreed that $3,000,000 of its first-mortgage bonds should be deposited with the defendants “ as security for the completion of the structure and equipment of the road, according to the provisions of the statutes of the United States providing for the building and completion, of said road and its equipments ”; and that the bonds so deposited should be held by the Treasury Department “ until the President of the United States, on a proper examination of the actual completed road and equipments, shall be satisfied that the same are so completed as a first-class railroad according to law.” The second of those *494 writings, “ as a further security to the same end,” agreed that “ the lands given to the company by the acts of Congress ” should “remain without patents being taken out therefor until the President of the United States, upon a proper examination of the actual condition of the road, its structure and equipments, shall be satisfied that the same have been completed according to law.”
It appears that the claimant was required by the Attorney-General of the United States to execute those papers “ as a guarantee for the ultimate full completion and equipment of its road ”; and that fact is relied on as giving full force and efficacy to the proceeding. However desirable it may have been that the road should be brought to a higher degree of completeness than that contemplated and required by the act, we were not referred to any statute which made the question of its completion dependent on the judgment or action of the Attorney-General, or vested him with any control over the action of the claimant in the premises. Hence when the claimant, in pursuance of his requirement, executed those papers, its- act in so doing was purely voluntary. Not only so, but the execution of those papers was directly in the claimant’s interest, and against that of the defendants. It was, on the one hand, the interest of the Government to begin, as soon as it lawfully could, the application of the five per cent, of the net earnings of the road to the payment of its bonds; while, on the other hand, it was the interest of the claimant to postpone to the latest possible da3r the payment of the five per cent., amounting the first year after the completion of the road to more than §135,000, and regularly increasing until, in the fifth 3*ear, it grew to more than $345,000. Whether the claimant was prompted b3' this large pecuniary interest to sign those papers does not appear by direct proof; but presumably it understood its interest, and saw that through the operation of those papers the time of the beginning of the five per cent, payment might be postponed, and well knew that every dayr’s postponement was for its direct and Large benefit. In point of fact, it was not until the 18th of November, 1874, that the President formally terminated the suspension of patents and ordered the issue of them for all the lands to which the claimant had become entitled. And it is claimed that this action of the President was decisive of the question of the completion *495 of tbe road and of tbe tune when, tbe computation of tbe five per •cent, payment should begin. This position, in our judgment, cannot be maintained, for tbe following reasons:
1. Tbe time of tbe completion of tbe road was to be determined in tbe way prescribed in tbe claimant’s charter, and in that way alone.
2. It was, therefore, wholly incompetent for tbe claimant, by its own sole act, to prescribe or authorize some other way to that end.
3. Tbe papers in question were no agreement on tbe part of tbe Government to submit tbe question of tbe time of completion of tbe road to tbe decision of tbe President, but only a voluntary agreement to that effect on the part of tbe claimant.
4. That agreement of the claimant did not and could not have, in law, any effect whatever to vest a power in tbe President which was not vested in him by law.
5. Therefore, when tbe President, in 1874, undertook to declare' tbe completion of tbe road, be • simply performed an act which, so far as it was adverse to tbe United States, was without legal authority, and therefore void.
6. Hence, if tbe declaration of tbe President in 3874 fixed tbe time of tbe completion of tbe road at a later day than that at which it bad before been fixed in tbe way prescribed bjr tbe act, then that declaration was wholly destitute of legal effect as against tbe United States.
This brings us directly to tbe great controlling point of tbe case, namely: When was the road completed and equipped within the meaning of tbe act? In the light of tbe views previously expressed there is but one answer to this, and that is, that when tbe last section of tbe road was reported by tbe commissioners and accepted by tbe President as completed, then tbe Union Pacific Eailroad was completed within tbe meaning of tlie act.
"When that last report was made, tbe legal question was not whether tbe road was then up to tbe condition of “ ultimate full' completion,” or to that of “ ultimate completion,” whatever either phrase might be held - to mean, but whether it bad been “completed and equipped as required by the act” to entitle tbe claimant to lands and bonds. When reported as having attained that condition of completion, and tbe report was accepted by *496 the President, the question of completion was finally settled and determined, unless it could be impeached for fraud.
Applying these views, we consider that the road was completed as a whole, 'within the meaning of the act, on the 15th of July, 1869; for on that day the President of the United States accepted the report of the commissioners on the westernmost and last section of the road, which report represented it “ as ready for present service, and completed and equipped as a first-class railroad.”
Nevertheless, we are of opinion that that date should not be adopted as the basis of the judgment of the court for reasons now to be stated.
On the 10th of April, 1869 (16 Stat. L., 56), Congress passed a joint resolution, the second section of which is as follows:
“ Sec. 2. That, to ascertain the condition of the Union Pacific Railroad and the Central Pacific Railroad, the President of the United States is authorized to appoint a board of eminent citizens, not exceeding five in number, and who shall not be interested in either road, to examine and report upon the condition of, and what sum or sums, if any, Avill be required to complete each of said roads, for the entire length thereof, to the said terminus as a first-class railroad, in compliance with the several acts relating to said roads.” * * *
In pursuance of that provision five commissioners were appointed, who examined the roads, and, on the 30th of October, 3869, made report thereon, which is given in full in the finding’ of facts, and from which we extract the following two paragraphs:
“In the opinion of the commission, the requirements of the law will be satisfied, and the designs of Congress carried out, if the roads be properly located, with judicious grades; have substantial road-beds of good width; ballasting which, with proper care, shall be able to keep the track in good condition throughout the year; permanent structures for crossing streams, good cross-ties, iron and joint fastenings; sufficient sidings, water-tanks, buildings, machinery, and adequate rolling-stock— the more important machine shops and engine-houses being of masonry — and the commission is glad to be able to say that, in its opinion, while some expenditures still need to be made, these two roads are substantially such roads to-day. The expenditures needed for completion will be given in detail for each road.
“ This great line, the value of which to the country is inestimable, and in' which every citizen should feel a pride, has been built in about half the time allowed by Congress, and is now a *497 good and reliable means of communication between Omaha and Sacramento, well equipped, and fully prepared to carry passengers and freight with safety and dispatch, comparing in this respect favorably with a majority of the first-class roads in the United States.”
The report, nevertheless, estimated that an expenditure of $1,586,100 would be necessary for the completion of the Union Pacific Eailroad.
Notwithstanding that estimate, the Secretary of the Treasury, on the 6th of November, 1869, ordered the issue of subsidy bonds due to the claimant on the westernmost and last section of the road; and in the presentation of this case the Government has treated that day as the one from which, for the purposes of the case, the completion of the road should be dated. We therefore hold that to be the day of the completion.
It remains to ascertain whether, after that day, there were net earnings of the road, and, if so, what amount.
In deciding what are net earnings, we take: 1. The gross receipts of the claimant from operating its road and telegraph line; and 2. The gross receipts from the rents of buildings, or parts of building's, belonging to the road; and from the aggregate of those two items we deduct the expenses of operating the road and line to earn the first description of receipts; and the remainder constitutes the net earnings.
The Supreme Court of the United States having, in Union Pacific Railroad Company v. Hall (91 U. S. R., 343), decided that the bridge constructed by the claimant over the Missouii Eiver at Omaha is a part of its road, the receipts therefrom and the expenses of operating it are brought into oirr computation hereinafter set forth.
In ascertaining the expenses of the road, we exclude all amounts paid on construction account, because the claimant is not, in our view, entitled to charge them against earnings until it shows that its construction fund was exhausted; and no attempt was made to show that. On the contrary, it must, as we conceive, be certain that that .fund has not yet been exhausted.
The claimant’s construction fund consisted of four items, viz: 1. Capital stock; 2. First-mortgage bonds; 3. United States bonds; and 4. Lands received from the United States.
From Senate Eeport No. Ill, Forty-fifth Congress, second *498 session, we ascertain that the amounts of the first three of these items were as follows:
1. Capital stock paid in. $36,762,300
2. First-mortgage bonds. 27,232,000
3. United States bonds. 27,236,512
Total. 91,230,812
In addition to this sum, the land grant to the claimant was about 12,000,000 acres, of which, up to July 1, 1874, only 3,445,781 acres had been patented to the claimant, leaving- nearly three-fomths of the entire grant not then fully available for any irarpose of expenditure, and, therefore, certainly not used in construction.
But of the quantity patented the claimant had, up to .that date, sold only 1,013,774 acres, leaving nearly 11,000,000 acres not yet at that time used for any purpose of construction.
As the claimant’s demand comes down only to December 31, 1875, we deem ourselves justified in holding that on that day there must have been millions of acres of those lands still undis-posed of by the claimant, the proceeds of the sales of which would more than suffice to meet all accruing outlays for construction. While that condition existed, we are clear in the opinion that the claimant had no legal right to charge any construction expense whatever against its gross earnings, so as thereby to diminish the amount of earnings out of which it should apply five per cent, toward payment of the bonds of the Government.
In ascertaining the expenses, there is another very large item of the claimant’s expenditures which we do not consider properly chargeable against its earnings, namely, interest paid on its floating and bonded debt. This cannot, in our judgment, be regarded as an expense of operating the road.
On the same ground we disallow the following items:
1. Expenses of land and town-lot department.
2. Taxes on lands and town lots.
3. Premiums on gold to pay coupons.
4. Bequixements of sinking funds.
5. Premiums bn Omaha bridge bonds redeemed.
In ascertaining the gross earnings of the road, we rest primarily upon the table of earnings set forth in finding XVIII, with the following deductions:
1. Fifteen per cent, from item 7 in each year.
*499 2. From item 12 ,in the year 1869-NO, the. sum of $23,400, being dividends from stock of Pullman Pacific Car Company, as set forth in the second table of earnings in finding XVIII.
In ascertaining the. expenses, we take the table of expenses set forth in that finding, and make deductions therefrom as hereinafter indicated.
Having thus stated our views of what legitimately constitute earnings and expenses, we tabulate the result, year by year, from November 6,1809, to November 5,1875, both inclusive, as follows:
1869-NO:
Gross earnings, as per findings.$8,125,212 40
Deduct therefrom—
Fifteen per cent, of item 7. $72,358 12
Pullman car dividends in item 12. 23,400 00
—:- 95, 758 12
Actual gross earnings. 8,029,454 28
Total expenditures, as per findings.$10,287,954 25
Deduct therefrom—
Printing bonds in
item 13. $10,339 76
Items 17 to 30, inclusive . 4,951,848 52
- 4,962,188 28
- 5,325,705 97
Net earnings for the year. 2, 703,688 31
3870-N1:
Gross earnings, as per findings. 7,563,006 59
Deduct 15 per cent, of item 7. 54,321 6S
Actual gross earnings. 7,508,684 91
Total expenditures, as per findings .$7,942,755 88
Deduct therefrom—
Printing bonds in item 33. $1,500 00
Items 17 to 30, inclusive . 4,245,440 96
-:— 4,246,940 96
- 3,695,814 92
Net earnings for the year. 3,812,869 99
*500 1871-’72:.
Gross earnings, as per findings.$8, 659,031 66
Deduct therefrom 15 percent. of item 7. 60,538 78
Actual gross earnings. 8,598,492 -88
Total expenditures, as per findings .$9,572,784 15
Deduct therefrom items 17 to 30, inclusive. 4,671,634 66
-- 4,901,149 49
Net'earnings for the year. 3,697,343 39
1872-’73: ' '
Gross earnings, as per findings. 10,667,117 26
Deduct'therefrom 15 per cent, of item 7. 69,860 10
Actual gross earnings... 10,596,257 16
Total expenditures, as per find-
ings .$9,968,854 70
Deduct therefrom—
New stations in item 1. $6,909 98
Items 17 to 30, inclusive . 4,642, 866 86
- 4, 649, 776 84
-:- 5,319,077 86
Net earnings for the year. 5,277,179 30'
1873-’74: "
Gross earnings, as per findings. 10,834,651 49
Deduct therefrom 15 per cent, of item 7. 76,004 77
Actual gross earnings. 10,758,646 72
Total expenditures, as per findings .$9,809,105 08
Deduct therefrom—
Tenements a n d
new stations in
item 1. $19,806 73
Engines, &c., in item 2. 26,133 68
Cars from item 3. 3,600 00
Laramie rolling-mills in item 4. 43,716 01
Printing bonds in item 13. 6,579 10
Items 17 to 30, inclusive . 4, 593,404 03
- 4,693,239 55
- 5,115,865 53
Net earnings for the year.-6-. 5,642,781 19
*501 1874D75:
Gross earnings, as per findings.$12,481,204 48
Deduct therefrom 15 per cent, of item 7. 98,646 28
Actual gross earnings. 12,382,558 20
Total expenditures, as per findings.$10,628,208 16
Deduct therefrom—
Tenements and new stations in item 1. $99,819 10
Engines, &c., in item 2. 75,727 83
Cars,&c.,initem3. 206,930 36
Laramie mills, item 4. 149,859 30
Items 17 to 30, inclusive . 4,631,496 86
- 5,163,833 45
- 5,464,374 71
Net earnings for the year. 6,918,183 49
RECAPITULATION.
Net earnings. Five per cent.
Year ending November 5,1870.. $2,703, 688 31 $135,184 42
Year ending November 5,1871.. 3,812,869 99 190, 643 49
Year ending November 5,1872.. 3,697,343 39 184,867 17
Year ending November 5,1873.. 5,277,179 30 263,858 96
Year ending November 5,1874.. 5,642,781 19 282,139 06
Year ending November 5,1875.. 6,918,183 49 345,909 18
28, 052, 045 67 1, 402, 602 28
Before declaring the judgment of the court, the question whether the claimant is legally bound to pay interest on the annnally-accrued five per cent, must be considered.
By the Act of 1862, the claimant is bound to repay to the defendants the amount of the bonds issued by them to it, together with all interest thereon which shall have been paid by the United States.
Toward providing an accruing fund for such repayment, the act authorizes the Government to retain one-half of the compensation earned by the claimant for services to the Government ; and requires the claimant, in addition thereto, after its road is completed, to pay annually at least five per cent, of its net earnings.
*502 In United States v. Union Pacific Railroad Company (91 U. S. R., 72), it was decided by tlie Supreme Court of tbe United States that tbe claimant is bound to pay those bonds and tbe interest thereon, only at tbe maturity of tbe bonds, thirty years after their date.
Whatever, therefore, of compensation for sendees rendered might be retained by the Government, or of five per cent, of net earnings might be paid to the Government, is to be applied, not inpreesenti, but to be held for application at the maturity of the bonds toward the payment of the principal and interest thereof.
As the act does not require the Government to allow the claimant interest on the compensation retained by it, nor require the claimant to pay interest on the five per cent, of net earnings from the expiration of each year in which they accrued, we are of the opinion that it was not the intention of the legislature to require the payment of interest on either side; and therefore, that no interest should be allowed against the claimant on the counter-claim.
The defendants, therefore, can recover only the five per cent, accrued, as above stated, viz, #1,402,602.28, less one-half of the amount of compensation for services rendered by the claimant, viz, #593,627.10; and for the balance of #808,975.18 judgment will be rendered in favor of the defendants.
Davis, J.:
I acquiesce in this judgment, in order to put the case in a shape to be taken to the appellate court, which both parties desire to have done. I agree in the disposition of the -principal question at issue, but for different reasons from those expressed by the Chief Justice. I dissent from the conclusions of my associates on minor points, which involve in the aggregate-large sums of money. The magnitude of the amounts at stake justifies an endeavor to state, as clearly as I am able, the points of difference, and the reasons for my opinions on the whole case.
The United States holds a double relation toward the Union Pacific Eailroad Company. On the one hand, as sovereign, it is the fountain of their corporate franchises; on. the other hand, as a great land-owner, it has contracted with them for the construction of a first-class railroad between two widely- *503 separated points of its territory. Tbis suit concerns only its relations as contractor.
Tbe provisions of tbe contract are few and simple. They may be found in tbe Acts of July 1, 1862, and July 2, 1864, enacted by tbe defendant, and both formally accepted by tbe claimants.
Tbe claimants agreed to construct a first-class railroad and a telegraph for a distance wbicb was subsequently ascertained to be 1,038.68 miles, tbe work to be done in sections, and tbe whole to be completed before July 1,1874.
Tbe defendant agreed, as each section was completed and accepted in a manner to be hereafter more particularly set forth, to deliver to tbe claimants patents for a certain quantity of land, and also its own bonds for specified amounts; tbe lands to be tbe claimants’ property; tbe bonds to be a loan of credit, to be redeemed by the claimants.
Tbe claimants agreed that one-half of tbe revenue derived from service for tbe defendant should be applied to tbe redemption of such bonds and interest; and also that after completion of tbe road five per cent, of its net earnings should be annually applied to tbe same object. They further agreed to transmit dispatches and transport mails, troops, munitions of war, supplies, and public stores for tbe defendant whenever requested, and always to give tbe Government preference in service.
Tbe issue and delivery of tbe subsidy bonds were to constitute ipso facto a mortgage on tbe railroad and telegraph; but tbe claimants were to be at liberty to make a first mortgage on their road to an amount equal to tbe proposed subsidy bonds, and to be issued in like manner as sections of tbe road should be completed; and the statutory mortgage and tbe ben of tbe United States bonds were to be subordinate to tbe said first mortgage, except as to the provisions relating to tbe transmission of dispatches and tbe transport of mails, troops, munitions of war, supplies, and public stores.
Under tbis contract work was begun in tbe autumn of 1865. Tbe President accepted tbe first section with deficiencies of construction, wbicb tip company agreed to remedy. He ordered tbe subsidies of both kinds to issue without waiting till tbe deficiencies should be supplied.
A board of experts bid been organized in order to secure a uniform standard of construction for adoption as sections should be presented for acceptance. Before the second section was *504 presented this board made its report, recommending that sections should be accepted in many respects incomplete, as measured by the statutory standard of a first-class railroad, and that the sections should be brought up to standard after acceptance. The President approved the report, and ordered directors and commissioners to guide themselves by it as a standard in directing or accepting work.
The various acts and measures which made the present contention possible grew out of this report and of the action of the President upon it. The course which it advised, and which was approved and followed until the whole road was open for traffic, is now assailed as a violation of law.
If that course had any warrant in the statute, it is to be found in the seventeenth section of the Act of 1862, providing for a retention of bonds as a guarantee for completion of the road; a provision repealed in 1864, but showing, so far as it bears on the question, a possible contemplation by Congress that sections would be accepted in an incomplete state. It can at least be said for it that, under its operation, a first-class railroad was constructed and equipped between the Missouri and the Pacific within three months of the period named in the statute, without affecting the company’s statutory obligations to the Government. These considerations, however, can be urged in the forum of public opinion more properly than in a judicial tribunal.
The work went on rapidly after it was once fairly begun. The proposed first mortgage was executed, and first-mortgage bonds were from túne to time issued and sold. In September, 1868, twenty-seven sections of the road, amounting to 760 miles, had been accepted by the President, and the issue of the subsidies thereon had been ordered. Much of the work on these accepted sections was far below the requirements of the statute. Under these circumstances, the opinion of the Attorney-General was taken as to the duties and responsibilities of the Executive.
Attorney-General Evarts answnred: “I entertain no doubt that the mode of procedure was a competeit and useful discharge of the executive duty in the premises. * * * But upon the same reasons, and in pursuance of the same method hitherto followed, I am of the opinion that it is entirely competent to the Executive * * * to provide for a revision of the work in the particulars in which a provisionalcompleteness of succes *505 sive sections was accepted, subject to an obligation on the part of tbe companies to make good, as far and as fast as might be, what needed to be subsequently supplied.” In conformity with tbis suggestion, the claimants in February, 1869, deposited with the defendant $1,600,000 of them first-mortgage bonds as security for the completion of the road according to law, and agreed that all their land patents might be retained for the same purpose. This was done by an instrument which I shall have occasion to consider hereafter.
On the 10th of the following April, Congress, by joint resolution, authorized the President to appoint a board of eminent citizens to visit the road and report what amount would be necessary to secure its completion according to law. They also directed the President, in order to secure such completion, to retain subsidy bonds enough for that purpose ; or, if that were impracticable, to require the company to return enough bonds to make, with the unissued bonds, the requisite amount; or, if both plans were found impracticable, to authorize the Attorney-G-eneral to institute a suit to protect the interests of the United States and to insure the completion of the road.
On the 10th of May, 1869, the last rail was laid, and it became possible for trams to run over the whole road. On the 13th of the same month a sworn certificate by the company’s officers of the completion of the last section, and also of the road as a whole, was laid before the President. On the 15th of the following July, he accepted the section and ordered the issue of the subsidies; but nothing was done by the departments on this order until November, for reasons Avhich clearly appear in the findings of fact.
There was a difference between the Central Pacific and the Union Pacific about the point of junction. Until that difference should be arranged, the distribution of the subsidy for a few miles of the through line on the one side of the other of the point of junction was uncertain. The Secretary of the Interior therefore recommended the President to authorize the bonds and patents due on account of the last section to issue only “ after full investigation of the respective claims of the two companies,” and to require the company to deposit with the Secretary of the Treasury the security for the ultimate completion of the road, which had been recommended in the Secretary’s letter of May 27,1869. In that letter the Secretary had designated the first-mortgage bonds of the company as the desired security.
*506 Tbe Secretary’s letter of tbe 27tb May, as well as that of July 15, was written after tbe Joint Eesolution of tbe lOtb April became law. We must therefore suppose that bis recommendations were intended to be in harmony with tbe expressed views of Congress; and we are warranted in assuming that neither tbe first nor the second modes of obtaining sufficient security were practicable. ' Instead of resorting to th e third mode, and obtain - ing security as tbe possible result of a successful law suit, tbe Secretary advised availing- of tbe §1,600,000 first-mortgage bonds already in tbe Government’s possession. Before tbe following November events took place which greatly affected the security which be proposed.
In tbe first place, tbe board of eminent citizens reported that constructive work to the amount of $1,586,100 remained to be done in order to bring tbe road and equipment to standard. This gave a measure for tbe amount of security to be taken.
In tbe next place, tbe point of junction of tbe two roads was so far settled that it became apparent that tbe Union Pacific road would be shortened some forty miles. It resulted from this that there was a large overissue of first-mortgage bonds, and that tbe bonds deposited with tbe Government as security were valueless.
It was therefore decided that these bonds should be canceled, and that tbe Government should look to tbe land patents for security; and it was further decided that one-half tbe remaining patents would be ample security for tbe sum named in tbe report of tbe board of eminent citizens, and that tbe other half might be delivered; and an executive order was issued from tbe Department of tbe Interior to that effect.
This order continued in force until tbe autumn of 1874. Tbe claimants repeatedly asked to have it rescinded or modified, but them requests were met by refusals to do so until an examination, to be made at their request, should show, that tbe road and equipment were completed up to the statutory standard.
In tbe summer of 1874 they asked to have such an examination made. Tbe commissioners appointed for tbe purpose reported that tbe deficiencies found in tbe summer of 1869 bad been more than supplied, and that tbe road was completed as a first-class road on tbe 1st day of October, 1874. Tbe President thereupon, on tbe recommendation of tbe Secretary of tbe Interior, revoked tbe order of November, 1869, and directed that tbe suspended land patents should be issued.
*507 At tbe trial, eachparty introduced evidence as to tbe time of tbe completion of tbe road, and eacb argued at length tbe bearing of tbe evidence upon tbe decision of that question. In my judgment tbe statute required tbe President to decide that question at tbe time of tbe occurrence of tbe completion. It was not to be settled in tbe future by evidence aliunde. Tbe statute empowered tbe President to determine, section by section, on evidence of a particular and prescribed character, when eacb section Avas completed. On eacb decision be was authorized to issue the- land and bond subsidies for the particular section, tbe eAÚdence on which tbe decision was formed being first filed in tbe Interior Department and in tbe Treasury. In practice he accepted incomplete Avork; but this did not modify tbe combined operation of tbe acceptance of tbe road and of the issue of tbe subsidies upon tbe agreement to pay tbe five per cent, of tbe net earnings. Tbe statute contemplated that, when tbe last section should be accepted and tbe last subsidies issued, tbe road would be complete as a money-earning machine, and tbe obligation to pay tbe five per cent, of net earnings would begin.
On tbe other band, tbe statutory contract bound tbe defendant to furnish, or to be ready to furnish, tbe subsidies, in order to entitle it to tbe payment of tbe five per cent. Tbe sequence in which tbe acts Avere to be performed shows this. First, tbe claimants Avere to construct and equip a-section of tbe road. Next, they Avere to ptresent it for acceptance. Next, tbe President, after examination by commissioners, was to decide whether the section was “ completed and equipped in all respects as required by tbe act.” Next, tbe land patents for tbe section were to issue from tbe Interior Department and tbe subsidy-bonds from tbe Treasury. Finally, after these things were done in detail, section by section, iwe per cent, of tbe net earnings were to be set aside Avhen tbe road should be completed as a whole. Tbe issue of tbe last subsidy and tbe completion of tbe road were to take place simultaneously, and tbe obligation to set aside five per cent, of tbe net - earnings was not to begin until after tbe occurrence of these tAvo simultaneous eArents.
If we quit this solid ground, there is no sure foothold for tbe construction of this contract.
We cannot say that tbe obligation to pay tbe five per cent, would arise on tbe completion of tbe road if no subsidy were furnished, since tbe payment is intended as a contribution toward tbe redemption of a portion of tbe subsidy.
*508 No one contends that it arose when the last rail was laid, on the 10th May, 1869, nor when, on the 13th of May, the president of the company made oath that the road was completed according to law.
If the obligation sprang solely from the President’s acceptance of the road, it had no reference to the outstanding amount of the loan subsidy, so long as something was outstanding, and was equally obligatory whether $2,700 or $27,000,000 were issued.
But if it was to spring from the completion of the road and the concurrent readiness to issue all the promised and unissued subsidy, which is the best construction of the statute, then we must remember that the issue of the land .subsidy was made by law as imperative on the G-overnment as the issue of the loan subsidy. Consequently, the expectation of the performance of the defendant’s promise respecting both classes of subsidy furnished the moving consideration for the claimant’s promise to set aside the five per cent. The Government could not, under the statutory contract, enforce upon the compan3r a performance of its agreement to do an act that was to be subsequent in time to the receipt of the subsidies, without showing either a readiness on its part to deliver all the undelivered subsidies, or a waiver on the part of the company to insist upon their delivery at the time and in the manner provided, by the contract.
Now, the Government, on the one hand, certainly did not fulfill its original engagements respecting the land subsidy until October, 1874. Had the delay happened without the consent and against the wishes of the claimants, the latter would have been free from the obligation to contribute the five per cent, during the detention. But we have seen that the delay in the delivery was caused by the making of a new engagement between the defendant and the company. On the 12th February, 1869, the officers of the latter executed an authorized instrument in which this language was used: “ The Union Pacific liailroad Company, having been requested by the Government of the United States * * *, as security for the due completion and equipment of its road * * *, to leave the lands given to the said company by act of Congress * * *, without taking out patents for the same, until the President shall be satisfied, upon proper examination of the road, its structure and equipments, that the same have been completed according to the provisions of *509 law * *. Now, this is to declare that the said company assents to the aforesaid requirements in respect to the lands given the said company as aforesaid.”
At a later date the Government consented to relinquish one-half of the suspended patents, and to hold the other half only for the performance of the specific work recommended by the board of eminent citizens, constituted under the Joint Resolution of April 10. In that step there was certainly nothing that weakened the force of the company’s consent to the reservation.
The recommendations of the board of eminent citizens contemplated the expenditure of upward of $1,000,000 upon sections which had been accepted, and for which the order for the entire subsidies had been made. These sections were therefore “com-' pleted?’ within the meaning of the term as used in the sixth sec-' tion of the Act of 1862. The obligation to contribute toward' the five per cent, so soon as the remaining sections should be “completed” had attached to them. Therefore, as to all such' sections, the statutory contract was abrogated by mutual consent on the 12th February, 1869, so far as related to the unissued land patents, and the Government became thereafter the custodian of the lands under a new agreement, and for a new pru’pose.
It is contended that the President had no x>ower to make this new agreement, and that his action in withholding the land patents under it was illegal and void. I donotthink so. Theaction of President Johnson, in February, 1869, was justified by the condition of the imfinished road at that time; and the subsequent action of President Grant, inrelinquishing half the patents which were held as security, was a compliance in spirit, if notin letter, with the requirements of the Joint Resolution of Congress of April 10,1869, and was a wise act of protection' to the Government and a liberal act as regarded the company.
We are now in a position to consider the President’s action, and to ascertain the day which he fixed as the date of the completion of the road.
There is no dispute about the first thirty-eight sections, 1,000 miles in all. They were accepted, and the order was made .for the issue of the subsidies before February 12,1869,' and it was to them that the provisions of that agreement immediately applied.
There remained then only 38.68 miles to be completed, in' order to entitle the Government to the five per cent. We have *510 already seen that the company certified on the ‘13th May that this section was completed, and that the President on the 15th July accepted it, and ordered the bond subsidy to be issued. The land subsidy had been disposed of by the agreement of the previous February.
The President’s order to issue the bond subsidy for this section was to take effect upon the happening of circumstances which were within the claimants’ control. The dispute with the Central Pacific Company was theirs, not the Government’s. The delay which it caused in the issue of the subsidy does not defer the defendant’s right to the payment of the five per cent, of the net earnings; This accrued on the 15th July, when the President rendered his decision that the road was completed, and ordered the subsidies to issue for it, and when the road consequently was completed in the eye of the law.
In order to ascertain what are the net earnings upon which the computation of the percentage is to be made, we must first settle what are tojbe taken as gross earnings.
The claimants carry on two distinct branches of business. They are common carriers and they are large landed proprietors. With the latter branch of their business we are not concerned, since the statute requires the payments to be made out of the net earnings of the road.
Confining ourselves to the former branch, the claimants maintain that the gross earnings of a corporation comprehend . all its gains from the legitimate exercise of all direct and incidental powers conferred upon it by its charter.
A railroad operated in connection with other roads is certain to bring into its owners’ hands moneys belonging' to other coinpa-■jiies for whom it collects freights at the stations of arrival on its own road, or for whom it sells passenger tickets. Assuming that the word “ gains ” is used in the claimants’ proposition in the sense of receipts on their own account, the statement; commands my assent; but it is also true that this particular corporation cannot set up against the United States, the grantor of their franchises, that they have corporate gains derived from the exercise of powers not conferred upon them by their charter. Income from tenement-houses, from hotels, from Pullman car-stock, from the rent of engines and cars, for services performed for other roads, and from investments outside of transportation, but not connected with the other branch of business, are to be *511 regarded as ancillary to the claimants’ exercise of their franchises as common carriers, and as necessary to the use of their road in the unsettled districts which it traverses.
The cost of earning gross earnings must be deducted from them in order to ascertain what are net earnings. This includes not only the actual expenses of transportation, but also general corporate expenses, such as salaries of officers, wages of em-ployés, taxes, assessments, insurance, law expenses, losses and damages to persons and property, and other similar charges, and, above all, the cost of maintaining the road, the plant, and the entire property, so that at the close of the year they shall be in as good condition as at the beginning.
The claimants further maintain that interest on loans and obligatory contributions to sinking funds, or to the redemption of the subsidy loan, are also proper to be deducted.
This proposition confounds two things which are quite distinct in themselves: the net earnings of the property and the net income of the owners of the property.
Regarding the property as an entity, the moneys which go into its construction, whether -stock or debt, are to be treated as capital. Its net earnings (that is, the net earnings of the property, not of the capital invested in it) are to be ascertained by the rule already, laid down. After they are ascertained, their application depends upon the respective priority of right of the different classes of capital which went into the construction of the property. Loan capital as creditor has priority over share capital as debtor and as the owner of the property. So, too, the higher classes of loan capital stand prior in right to the lower classes. -But, though the just claims of loan capital must be satisfied before share capital can receive anything, it is wrong to say that they must be satisfied before the net earnings of the property itself can be ascertained.
The claimants also contend that the tenth section of the Act of 1864 postpones the payment of the five per cent, until the payment of the first-mortgage debt and interest. This contention cannot be maintained. It is true that the section referred to recognizes that the United States has a lien upon the property to enforce both the payment of the subsidy bonds and the rights reserved by the sixth section of the Act of 1862. The light of the defendant to the five per cent, is clearly subordinated by it to .the rights of the first-mortgage bondholders.'! If *512 net earnings 'will not satisfy first-mortgage interest and the five per' cent., the latter must give way to the former. When the principal of the mortgage debt matures, it will be a charge on revenue prior to the five per cent. But, as between the Government and the companj', there is no change in the definition of net earnings; no enlargement of the rights of the company; no discharge of the right of the Government to claim and receive the five per cent., if earned and not required for the ex-tinguishment of mortgage debt or interest.
Some expenditures for “ station buildings,” “tenement-houses and hotels,” “engine-equipment,” “tanks and water-tanks,” “new shops and machines,” “car-equipment,” and “Laramie rolling-mills” are said to be improperly charged to earnings.
Undoubtedly new construction, theoretically, should come from capital. Practically it is often difficult to separate new from old. A station is rebuilt on a larger scale; an iron bridge replaces a wooden bridge; an old car or locomotive is rebuilt; a steel rail is substituted for an iron rail. Many prudent managers think it best not only to make such “construction” as this out of earnings, but even to resort to that source for the increase demanded by the ordinary growth of traffic rather than swell capital account bjr augmenting* the funded debt or shares. Such matters are usually left to .the discretion of a board of directors. The organic law of the corporation placed representatives of the Government in the direction to guard the interests of the United States. It was the duty of these agents — perhaps it is not too much to say that it was their principal duty — to watch the expenditures of the company, and to see that none were made from earnings which would improperly reduce the amount upon which the Government’s percentage was to be calculated. In the absence of complaint from them, I do not think this court should impose upon the company an inflexible rule, which is often practically opposed to sound and economical administration. The expenditures objected to certainly increased the value of the security which the Government holds for the ultimate retirement of the loan subsidy.
The items relating to the Omaha bridge are in dispute. The bridge was constructed under authority contained in the ninth section of the Act of 1864. The Act of 1871 authorized the" ■claimants to contract a mortgage debt for its construction. The mortgage failed to realize enough to meet its .cost, and the *513 deficit (about $28,000) was met from earnings. The bridge accounts are now carried into the general operations of tbe road. Although technically a separate property, the bridge is practically operated as a part of the claimants’ road, and is, in fact, necessary to it. If the principles which I have laid down are correct, its receipts should form a part of gross earnings, and the cost of its operation a part of the expenditures, to be deducted from gross earnings. The small outlay in its construction not having been objected to by the Government directors, is to be treated as legitimate. The interest paid on its mortgage is to he treated as the interest on the other funded debt of the company.
Some charges for the printing of corporation bonds were objected to. On the principles laid down, they are fairly within the corporate expenses which are chargeable to earnings. On the other hand, sundry contested expenditures for expenses of town lots and taxes on land and town lots are properly held by the court not to be chargeable to the earnings of the road.
The claimants are bound to apply the five per cent, of the net earnings of the road annually; that is to say, on the recurring anniversary of the day of the month on which the road was completed. The defendant maintains that the obligation to pay the percentage began on the 6th November, 1869, and makes a rest annually between November 5 and November 6 in the tables ■which it furnishes. I agree that the defendant can waive the percentage between the 15th July and the 6th November. I do not agree that the road was completed for the first time on the latter date; but I think we are warranted, on the pleadings in this suit, in giving judgment from and including the 6th November, 1869.
On the principles which I have laid down, the respective annual amounts for which the defendant would be entitled to judgment are the following:
For the year ending November 5, 1870 . $94,606 48
1871 . 189, 942 09
1872 . 163,000 32
1873 . 258, 002 77
1874 . 271,871 74
1875 . 324,084 15
Total. 1,301,407 55
*514 I agree with my associates that no interest should be allowed on these sums.
It is conceded by the Government that at the commencement of this suittheclaim ants had earnedin the transportation ofmails, troops, munitions of war, and supplies, and hi the transmission of dispatches, $1,187,254.21, none of which has been paid, In this suit the claimants are entitled to recover one-half that amount, $593,627.10. That amount should be deducted from the defendant’s counter-claim, and the defendant, in my opinion, should have judgment for $707,880.45
This result differs from that reached by my associates by $101,194.73. For reasons already given, I surrender my own convictions and I concur in forming the judgment of the court.
Eichardson, J., concurred in the opinion read by the Chief Justice.
Nott, J., heard the ease, but was prevented by illness from being present when it was decided.